JUDITH W. GABRIEL,               )
INDIVIDUALLY AND AS EXECUTRIX    )
OF THE ESTATE OF ROBERT J.       )
GABRIEL,                         )
        Plaintiff,               )
                                 )
        v.                       )        C.A. No. 11-12307-MLW
                                 )
JACKSON NATIONAL LIFE            )
INSURANCE COMPANY, F/K/A         )
REASSURE AMERICA LIFE INSURANCE  )
COMPANY, F/K/A VALLEY FORGE      )
LIFE INSURANCE COMPANY,          )
        Defendant.               )

## MEMORANDUM AND ORDER

WOLF, D.J.                                        March 26, 2015

## I.    INTRODUCTION

Judith W. Gabriel brought this action both individually and as executrix of her husband Robert J. Gabriel's estate, to recover a $500,000 death benefit from Flexible Premium Adjustable Life Insurance Policy No. 82010817 (the "'817 Policy"). The '817 Policy was issued by Valley Forge Life Insurance Company ("Valley Forge"). Valley Forge is the predecessor in interest to Reassure America Life Insurance Company ("Reassure America"), which assumed all obligations relating to the '817 Policy and which was the original defendant in this case. On December 31, 2012, Reassure America merged

into Jackson National Life Insurance Company ("Jackson National"), which is the current defendant.

Mrs. Gabriel's husband, Robert J. Gabriel, died on August 27, 2010. Mrs. Gabriel was the beneficiary of the '817 Policy. However, Reassure America denied her claim for the $500,000 death benefit because, it asserted, the policy had terminated on April 19, 2010, due to Mr. Gabriel's failure to timely pay the required premium.

In her Complaint, the plaintiff alleged that Reassure America breached the '817 Policy by repeatedly overstating the premium payments necessary to keep coverage in force in the Grace Notices that it sent to Mr. Gabriel. She also contended that Reassure America breached the '817 Policy by failing to provide Mr. Gabriel the full 61-day grace period to make payments required under the contract. The plaintiff also asserted that the '817 Policy was subject to the three-month notice requirement of M.G.L. c. 175, §110B, and that Reassure America failed to comply with that statute. Finally, the plaintiff claimed that Reassure America and the current defendant, Jackson National, engaged in unfair and deceptive business practices, in violation of M.G.L. c. 93A.

On August 20, 2014, at the final pretrial conference, the court ruled that, under both M.G.L. c. 175 §110B and the terms

2

of the '817 Policy, Mr. Gabriel should have been allowed until May 13, 2010, to make a payment sufficient to continue coverage. Therefore, by terminating the '817 Policy on April 19, 2010, Reassure America violated §110B and breached the '817 Policy. The court further found that Reassure America breached the '817 Policy each time it overstated the amount that Mr. Gabriel was "required" to pay to keep his coverage in force.

Following that pretrial conference, the parties agreed that summary judgment should enter in favor of the plaintiff on the breach of contract (Count I) and violation of §110B (Count VIII) claims because, they agreed, Mrs. Gabriel had tendered a payment sufficient to keep the '817 Policy in force on May 5, 2010, and Reassure America would not have accepted any premium payment after April 19, 2010. The parties further agreed that several of the plaintiff's other claims, which presented alternative theories of recovery to the breach of contract claim, should be dismissed without prejudice.

The court is now entering judgment for plaintiff on Counts I and VIII. The court is dismissing Counts II, III, IV, and VI without prejudice.

After these agreements by the parties, the sole remaining unresolved claim was plaintiff's allegation that Reassure America's practices violated Chapter 93A (Count IX). The court

3

began a bench trial on this issue on September 4, 2014. After the conclusion of the trial, the court took the matter under advisement.

Based on the evidence presented at trial, the court finds that Reassure America violated Chapter 93A in two ways. First, the Grace Notices that Reassure America sent to Mr. Gabriel were deceptive in violation of Chapter 93A. Each Grace Notice substantially overstated the amount that Mr. Gabriel was required to pay to keep his coverage in force under the terms of the policy. Most importantly, the deceptive March 15, 2010 Grace Notice and April 2010 Payment Notice each caused David Gabriel to not pay an amount sufficient to keep the policy in force. This resulted in the wrongful termination of Mr. Gabriel's coverage under the '817 Policy.

Second, defendant's misrepresentations constituted a coercive breach of contract, in violation of Chapter 93A. The '817 Policy required Reassure America to send Grace Notices informing Mr. Gabriel of the minimum amount necessary to keep his coverage in force. Instead, each Grace Notice that Reassure America sent threatened Mr. Gabriel with termination of his coverage unless he paid several thousand dollars more than the policy required to maintain coverage.

The court further finds that Reassure America acted in a willful and knowing manner in committing these unfair trade practices. At the time the Grace Notices were sent to Mr. Gabriel, Reassure America employees knew that they were misrepresenting the amount required to continue coverage. In addition, no Reassure America employee ever attempted to determine whether the Grace Notices complied with the terms of the '817 Policy.

The court is awarding Mrs. Gabriel treble damages because of the egregious nature of Reassure America's misconduct. For years, Reassure America used its informational advantage and the threat of cancelling Mr. Gabriel's coverage to extort thousands of dollars in excess premiums from him months before the premiums were due. These misrepresentations were the result of a deliberate choice to change the Grace Notice templates that were used to administer the '817-type policies. Furthermore, the importance of deterring this type of difficult-to-detect misconduct in the future make an award of treble damages most appropriate.

Therefore, the court is ordering the entry of judgment for plaintiff in the amount of $1,774,849.32: $1,500,000 (three times the actual damages of $500,000) plus $274,849.32 (prejudgment interest at the rate required by Massachusetts law

5

on $500,000 accrued between Mr. Gabriel's death, on August 27, 2010, and the entry of judgment). The court is also awarding the plaintiff all of her reasonable attorneys' fees and costs incurred in connection with this litigation.

## II. PROCEDURAL HISTORY

### A. The Complaint and the Motion to Dismiss

This case was originally brought in Plymouth Superior Court of the Commonwealth of Massachusetts. It was removed to this court based on diversity jurisdiction. See 28 U.S.C. §§ 1332(a), 1446(b). The Complaint asserted a variety of state law claims: (I) breach of contract; (II) breach of the implied covenant of good faith and fair dealing; (III) fraud/deceit; (IV) negligent misrepresentation; (V) quantum meruit/unjust enrichment; (VI) equitable estoppel; (VII) violation of M.G.L. c. 175, §187; (VIII) violation of M.G.L. c. 175, §110B; and (IX) violations of M.G.L. c. 93A, §§2, 9.

Pursuant to Federal Rule of Civil Procedure 12(b)(6), the defendant moved to dismiss all counts of the Complaint for failure to state a claim upon which relief can be granted. For the reasons described in court on October 15, 2012, the court allowed Defendant's Motion to Dismiss with respect to Count VII, which alleged a violation of M.G.L. c. 175, §187. The Motion to

Dismiss was denied with respect to all other counts. See Oct. 15, 2012 Order.

B.    The Cross-Motions for Summary Judgment

Following discovery, both parties moved for summary judgment on all remaining counts. The court held a hearing on these motions on April 18, 2014.

In its motion for summary judgment, the defendant argued for the first time that the plaintiff's claims were preempted by ERISA. At the hearing, the court noted that ERISA preemption is a waivable affirmative defense. See Wolf v. Reliance Std. Life Ins. Co., 731 F.3d 444, 449 (1st Cir. 1995). The court ruled that the defendant had waived this argument by failing to present it earlier in the case, and denied any implicit motion for leave to amend the Answer. First, the court concluded that allowing the defendant to assert a new defense after the close of discovery would be prejudicial to the plaintiff, particularly in view of the additional discovery that would be necessary. See Apr. 18, 2014 Tr. at 13. Second, the court concluded that an amendment would be futile because the insurance plan at issue in this case was not for an "employee." Therefore, the plan fell outside the ambit of ERISA. See id. at 14 (citing Raymond B. Yates, M.D., P.C. Profit Sharing Plan v. Hendon, 541 U.S. 1, 21 (2004)).

The court then addressed the plaintiff's claims. First, the court interpreted the grace period provision of the '817 Policy. See Clark School for Creative Learning, Inc., v. Philadelphia Indem. Ins. Co., 734 F.3d 51, 55 (1st Cir. 2013) ("The interpretation of an insurance policy is a question of law for the court."). In pertinent part, the '817 Policy provided that:

> A grace period of 61 days will be granted for the payment of a premium large enough to cover the monthly deduction. Notice of such premium will be mailed to your last known address.

'817 Policy at 10. The court found that this language was unambiguous and that the Grace Notices under the '817 Policy were required to specify the minimum payment necessary to keep the plan in force. See April 18, 2010 Tr. at 30.

Applying this interpretation to the undisputed facts, the court concluded that the March 15, 2010 Grace Notice did not comply with the terms of the '817 Policy and misrepresented the amount that Mr. Gabriel was required to pay. See April 18, 2010 Tr. at 29-30. Specifically, the court found that although the March 15, 2010 Grace Notice stated that the amount "required" to continue coverage was $10,852.64, the actual negative cash value of the policy at that time was only $2495.25. Including the mandatory nine-percent "load charge" on any premiums, a payment

of $2742.03 would have been sufficient to cover the monthly deduction and continue coverage. Therefore, the court found that Reassure America had breached the contract by demanding payment of an amount that was $8110.61 higher than the amount required by the policy to continue coverage. See id. at 29-30, 47.

The court acknowledged the defendant's motive may have in part been to benefit the policy holder by making him pay more than the minimum required amount in order to ensure that his coverage was not at risk every month. However, the court explained that the contract did not permit such a practice. See id. at 32-33. Therefore, the court found that the contract had been breached and that Reassure America had made misrepresentations to Robert Gabriel. See id. at 47.

The court concluded that there was a genuine dispute of material fact regarding causation, which is an essential element of a breach-of-contract claim. See Amicas v. GMG Health Sys., Ltd., 676 F.3d 227, 231 (1st Cir. 2012) ("[I]f damages are sought causation and the amount of damages must also be proved."). In particular, the court explained that "reasonable jurors could disagree as to whether harm was caused or whether Mr. Gabriel knew he could pay a lower amount and [did not] rely on the [Grace] Notices." See Apr. 18, 2014 Tr. at 47.

The plaintiff also argued that the defendant had breached the contract because it had failed to send the notice at the beginning of the 61-day grace period. The plaintiff asserted that the company instead had a policy of sending the notice 31 days before the end of the grace period. Furthermore, the plaintiff contended that this practice was inconsistent with the policies of other insurance companies. The court explained, however, that the analysis must turn on the terms of the '817 Policy, rather than whether Reassure America's policies comported with prevailing industry practices. See id. at 42. This matter of contract interpretation was not decided at the hearing.

The court also discussed the Chapter 93A claim. The court noted that, even if the rest of the claims could be resolved on summary judgment, the court would have to hear evidence to determine whether multiple damages were appropriate. See id. at 44-45. For this reason, and because of the remaining genuine dispute of material fact concerning causation, the court substantially denied the plaintiff's motion for summary judgment completely. The court allowed the defendant's motion for summary judgment with respect to the unjust enrichment claim

(Count V),[1] but denied it with respect to all other claims. The court stated that it was denying the defendant's motion for summary judgment without prejudice with respect to Count VIII (M.G.L. c. 175, §110B), which would be addressed at the final pretrial conference. See Apr. 23, 2014 Order.

## C. August 20, 2014 Final Pretrial Conference

In anticipation of the pretrial conference on August 20, 2014, the parties filed motions in limine. Several of these motions concerned the admissibility of certain evidence at trial. However, the parties' main disagreements concerned the matters of law left unresolved at the April 18, 2014 summary judgment hearing. In particular, the parties disagreed about: (1) whether the '817 Policy was subject to the requirements of M.G.L. c. 175, §110B; and (2) whether the 61-day grace period provided by the '817 Policy started when Mr. Gabriel received the Grace Notice or at an earlier time.

### 1. The Application of M.G.L. c. 175, §110B

The court ruled that M.G.L. c. 175, §110B applied to the '817 Policy. See August 20, 2014 Tr. at 5, 27. Section 110B establishes requirements for certain premium notices to protect an insurance policy owner from losing his insurance coverage

---

[1] The court concluded that because there was a valid contract in this case, the doctrine of unjust enrichment does not apply, and therefore that claim should be dismissed. See April 18, 2015 Tr. at 48.

unexpectedly.  See Cimon v. Gaffney, 401 F.3d 1, 5 (1st Cir.
2005).  Section 110B provides heightened notice requirements for
the termination of insurance policies that are: (1) not subject
to unilateral cancellation by the insurer; (2) not renewable or
continuable with the insurer's consent; and (3) not policies for
which the premiums are payable monthly or at shorter intervals.
See M.G.L. c. 175, §110B.  It provides that insurance policies
subject to its requirements shall not terminate until three
months after the due date of the premium amount.

However, §110B also carves out an exception to the general
three-month rule.  A policy may terminate or lapse before the
end of three months if the insurance company sends a notice: (1)
between 10 and 45 days prior to the due date; (2) showing the
amount of "such premium"; (3) showing the due date; and (4)
containing a "statement as to the lapse in the policy if no
payment is made as provided in the policy."  See M.G.L. c. 175,
§110B.  If the insurance company does not send such notice, the
insured has three months from the due date to pay the premium.
See id.  Simply put, the section "provides that a policy cannot
be terminated for nonpayment of a premium until three months
after the date on which the premium was due (unless notice was
sent in accordance with the statute)."  Cimon, 401 F.3d at 5.

The defendant argued that because the '817 Policy contained a "Continuation of Insurance" provision, it fell within §110B's exception for policies that were "renewable or continuable with [the insurer's] consent." This contention relied on a provision of the '817 Policy that stated:

### CONTINUATION OF INSURANCE

In the event Planned Periodic Premiums are not paid, insurance coverage under this policy and any benefits provided by rider will be continued in force. Such coverage will continue until the Cash Surrender Value is not sufficient to cover the monthly deduction, except as provided in Section 2: Grace Period.

'817 Policy at 11.

The court found defendant's proposed interpretation of both §110B and the '817 Policy to be incorrect. It held that the Continuation of Insurance provision did not make the policy "continuable with [the insurer's] consent." See August 20, 2014 Tr. at 12 (citing M.G.L. c. 175, §110B). Instead, the court ruled that the provision provided that the continuation of coverage would be automatic as long as the policyholder had sufficient funds in his account to cover the required premium. It, therefore, did not provide the defendant with any discretion concerning whether to cancel or continue the policy, as required by §110B. See id. at 13 (citing Kavanagh v. N.Y. Life. Ins. Co., 170 F.3d 253, 257 (1st Cir. 1999)).

The court held that Reassure America had violated §110B by not providing Mr. Gabriel with the required three months to pay before terminating the '817 Policy. See August 20, 2014 Tr. at 14, 41. As the First Circuit stated in Cimon, a policy subject to §110B cannot be terminated for nonpayment of any premium within three months of the failure to pay, unless the insurance company has given the insured notice of the premium due and its due date within 10 to 45 days of that due date. See 401 F.3d at 5. The court had already determined, at the April 18, 2014 summary judgment hearing, that the March 15, 2010 Grace Notice overstated the amount required to keep the policy in force. Therefore, the court concluded that the defendant did not satisfy the §110B requirement that the notice specify the actual premium due. Because Reassure America never sent Mr. Gabriel §110B-compliant notice, the protections of §110B applied. Accordingly, the court held that Mr. Gabriel should have been given at least three months from February 13, 2010, meaning until May 13, 2010, to make a payment sufficient to keep his policy in force. See August 20, 2014 Tr. at 14, 41.

### 2. The 61-Day Grace Period

The court next reviewed the '817 Policy to determine when the 61-day grace period should have started. In doing so, the court considered "the actual language of the ['817 Policy],

given its plain and ordinary meaning." See August 20, 2014 Tr. at 28 (citing Brazas Sporting Arms, Inc. v. Am. Empire Surplus Lines Ins. Co., 220 F.3d 1, 4 (1st Cir. 2000)). The court recognized that, "[i]f the meaning of the contract language is unclear, [the court] 'consider[s] what an objectively reasonable insured, reading the relevant policy language, would expect . . . .'" Id. (quoting Metro. Life Ins. Co. v. Cotter, 984 N.E.2d 835, 844 (Mass. 2013)).

Applying these principles, the court found that Mr. Gabriel was entitled to 61 days' notice, starting at the earliest from the date the Grace Notice was mailed. The court held that a reasonable insured would have expected to have the 61 days to make a sufficient premium payment from the date he was notified of that deficiency. Therefore, because the Grace Notice was mailed on March 15, 2010, Mr. Gabriel should have been given until at least May 15, 2010, to remit payment. See id.

The court also noted that, in light of its ruling regarding the applicability of §110B, the interpretation of the grace-period provision of the '817 Policy would have no practical effect on the defendant's liability. See id. at 28-29, 32. The plaintiff claimed to have tendered sufficient payment to keep the policy in force on May 5, 2010. See id. at 44. Under either the court's ruling on §110B or the grace period, Mr.

Gabriel should have been given until at least May 13, 2010, to make a payment sufficient to bring his policy out of grace. See id. at 41, 44-45.

### D. Developments Following the August 20, 2014 Pretrial Conference

Following the court's rulings on §110B and the 61-day grace period, the issues for trial were reduced significantly. The primary remaining dispute was whether Mr. Gabriel tendered payment on May 5, 2010, in the form of a check for the full $10,852.64, and whether the defendant's refusal to accept that payment caused damage to Mr. Gabriel and his estate. See Aug. 20, 2014 Tr. 28. Therefore, the court scheduled a jury trial, to begin on September 2, 2014, to resolve these questions and to hear evidence on the plaintiff's other claims.

Shortly after the pretrial conference on August 20, 2014, the parties reported that in light of the court's rulings on §110B and the 61-day grace period, there was no remaining genuine dispute of material fact concerning the plaintiff's claims for breach of contract (Count I) or violation of §110B (Count VIII). Although the defendant reserved its right to appeal the court's legal rulings, it conceded that "it is undisputed that Reassure America would not have accepted a premium payment after April 19, 2010, the date upon which

Reassure America maintains that the policy terminated."
Defendants' Submission in Advance of August 29, 2010 Pretrial
Conference (Docket No. 148) at 2. The parties also did not
dispute that Mr. Gabriel tendered such a payment by May 5, 2010.
The plaintiff, therefore, requested that the court enter
judgment on Count I and Count VIII in her favor. In view of the
court's rulings of law, and in the absence of any genuine
dispute of material fact, the court is now entering judgment for
the plaintiff on Counts I and III.

Following another pretrial conference on August 27, 2014,
the parties agreed that the only matter to be resolved at trial
was the plaintiff's Chapter 93A claim (Count IX). The parties
agreed that resolution of the plaintiff's other remaining
claims, which were alternative theories of recovery, would be
unnecessary in light of the proposed entry of summary judgment
on Counts I and VIII. The plaintiff, therefore, submitted a
motion to dismiss Count II (breach of the implied covenant of
good faith and fair dealing), Count III (fraud/deceit), Count IV
(negligent misrepresentation), and Count VI (equitable estoppel)
(Docket No. 163). This motion requests that, if the court's
legal rulings are reversed on appeal, the plaintiff be permitted
to reinstate these counts, which would relate back to the
original filing of the plaintiff's Complaint for purposes of the

17

statute of limitations. The defendant did not oppose this motion. The court is, therefore, allowing it.

In view of the parties' agreement to narrow the issues to be tried to plaintiff's M.G.L. c. 93A claim, the court conducted a bench trial rather than a jury trial.

E.    The September 2014 Bench Trial on Chapter 93A

The bench trial on the plaintiff's Chapter 93A claim began on September 4, 2014. The plaintiff called several witnesses. Judith Gabriel testified about her experience with the '817 Policy, particularly following its termination in April 2010. Thomas Melody, the accountant for R.J. Gabriel Construction, testified about his bookkeeping practices at the company. David Gabriel, Robert Gabriel's son and the president of R.J. Gabriel Construction, testified about, among other things, his receipt of the March 15, 2010 Grace Notice and the reason he did not pay the $10,852.64 that it improperly stated was "required." Donald Sanders, the Vice President of Third-Party Administrator Oversight at Jackson National, testified about Reassure America's practices concerning policy administration and its revisions of Grace Notice templates. Barbara Cowens, who had been employed from 2006 to 2012 as a Senior Vice President at Swiss Re, which owned Reassure America, testified about the company's practices concerning Grace Notices. Finally, the

18

plaintiff called Rochelle Walk, a complaint specialist at Reassure America, who prepared and sent a response to the plaintiff's Chapter 93A demand letter in 2011.

The defendant called one witness, Bradford Meigs, who was the insurance agent for the '817 Policy. Meigs testified about his experience assisting Mr. Gabriel with the policy, including communicating with Reassure America about other Grace Notices and coordinating premium payments.

The trial concluded on September 8, 2014, and the court took the matter under advisement.

III. FACTS

With regard to plaintiff's Chapter 93A claim, the court finds the following facts proven by a preponderance of the evidence.

A.    The '817 Policy

On September 13, 1985, Robert J. Gabriel became covered under the '817 Policy, which was issued by Valley Forge. This policy provided for a death benefit of $500,000. Mr. Gabriel also purchased similar coverage under the "'818 Policy", which provided for a death benefit of $200,000.

In 2000, Mr. Gabriel's wife, plaintiff Judith Gabriel, became the primary beneficiary of the '817 Policy. She remained

the primary beneficiary until the policy's termination in April 2010.

In 2004, Valley Forge was acquired by Reassure America, which assumed all obligations relating to the '817 Policy and which was the original defendant in this case. On December 31, 2012, Reassure America merged into Jackson National, which is the current defendant.

The '817 Policy permitted Mr. Gabriel to make premium payments whenever convenient, though the insurance company recommended certain periodic premium payments ("Planned Periodic Premium payments") to keep his policy in force over time. On the thirteenth day of each month, a certain amount would be deducted from the policy's overall cash value to pay for the cost of insurance and fees. Over the life of the '817 Policy, the monthly deduction grew from several hundred dollars to $1474.78 in February 2010. See Ex. 57.

When Mr. Gabriel purchased the '817 Policy in 1985, his initial premium payment was $17,724.00, and his recommended annual premium payment when his coverage began was $4794.00. Because of Valley Forge's 9% "load charge" on each premium payment, only 91% of each payment was actually available to cover the monthly deductions. To account for changes in the cost of insurance and skipped premium payments, Valley Forge

unilaterally increased Mr. Gabriel's Planned Periodic Premium payments. On September 24, 2002, Valley Forge explained that it had increased his quarterly Planned Periodic Premium to $2621.00, which was more than double the previous quarterly Planned Periodic Premium of $1243.00. See Ex. 55.

The overall value of the policy was reflected in the policy's Gross Cash Value, which was recalculated every month to reflect the most recent monthly deduction, any premium payments by the policyholder, and any interest accrued. The '817 Policy guaranteed a minimum interest rate of six percent on the Gross Cash Value, compounded annually, and the actual interest rate was often higher.

A related figure, the Cash Surrender Value, was calculated by subtracting from the Gross Cash Value any loans taken out on the policy and the surrender charge, a fee that would be imposed in the event of policy cancellation by the policyholder. Surrender charges were eliminated after the first ten years of the policy. Because Mr. Gabriel never had any policy loans, the Cash Surrender Value and Gross Cash Value were equivalent starting on September 13, 1995.

The '817 Policy also specified the circumstances under which the policy would lapse for nonpayment of premiums. Section 2 of the '817 Policy provided that:

> The grace period provision becomes effective in the event the Cash Surrender Value, as defined in Section 3, is not large enough to cover the next monthly deduction, as defined in Section 3.
>
> A grace period of 61 days will be granted for the payment of a premium large enough to cover the monthly deduction. Notice of such premium will be mailed to your last known address. If such premium is not paid within the grace period, all coverage under the policy will terminate without value at the end of the 61 day period.

Ex. 1 at 10. As explained earlier, the court has previously held that, under this provision, the company was required to send a Grace Notice that stated the minimum payment necessary to cover the monthly deduction. The court has also ruled that the 61-day grace period did not start before the Grace Notice was mailed to the policy holder.

B.   Robert Gabriel's Payment History

As permitted by the terms of the '817 Policy, Mr. Gabriel did not consistently make Planned Periodic Premium payments. In the 1990s, for example, he made no premium payments in seven out of eight consecutive years. However, the Cash Surrender Value was typically substantial. For example, it was $20,961.17 in October of 1993. There was enough money during the 1990s to cover the monthly deductions.

Gradually, the Cash Surrender Value of the '817 Policy declined and was often insufficient to cover monthly deductions. Over the life of the policy, the Grace Period Provision was triggered several times. Mr. Gabriel received six Grace Notices alerting him that he had entered the grace period.

The first Grace Notice was sent by Valley Forge on September 24, 2002. It explained that the Cash Surrender Value had been insufficient to cover the two previous monthly deductions ($673.24 in August 2002 and $753.48 in September 2002), and that the '817 Policy would lapse if Mr. Gabriel did not send "sufficient premium to pay the past due monthly deductions" by October 25, 2002. In addition to stating the minimum payments required to continue coverage, the Grace Notice recommended that Mr. Gabriel make a payment of $3706.22, which the Grace Notice stated would be sufficient to continue his policy to the next scheduled premium date, December 13, 2002. See Ex. 55. On October 6, 2002, Mr. Gabriel sent Valley Forge a check for $3706.22. This check was drawn from the account of R.J. Gabriel Construction Company, Inc., of which Mr. Gabriel was then the president. See Ex. 91.

Following Reassure America's acquisition of Valley Forge in 2004, Reassure America administered Valley Forge's life insurance policies. These included twenty-eight different forms

of flexible premium life insurance policies, each of which had different provisions. Reassure America periodically updated the templates for the Grace Notices for the Valley Forge policies, relying in part on its compliance department. However, there was no evidence, let alone proof, that any Reassure America employee actually determined that the '817-type policies were being properly administered in accordance with their terms and with statutory requirements. Nor was there evidence, let alone proof, that any Reassure America employee ever determined that the updated Grace Notice templates for '817-type policies complied with the terms of the policies.

Mr. Gabriel next received a Grace Notice dated November 14, 2005, from Reassure America on Valley Forge letterhead. This letter asked Mr. Gabriel to "please remit $11,450.84 so that payment is received in our office on or before December 13, 2005[,] which is the end of your grace period." Ex. 60. At the time of the Grace Notice, however, the negative Cash Surrender Value of the '817 Policy was only $1086.18, which meant that, including the 9% load charge, Mr. Gabriel was required to pay only $1,193.60 to bring the policy out of grace. After Mr. Gabriel's insurance agent, Bradford Meigs, called Reassure America on December 12, 2005, he was informed that Mr. Gabriel should pay $6208.84 to keep the policy in force through March

13, 2006. Mr. Gabriel promptly sent a check for $6300.00 by overnight mail to ensure continued coverage. This check was drawn on the account of PAD Corporation, another of Mr. Gabriel's companies. See Ex. 93. Because of errors in processing, however, Mr. Gabriel was sent a termination notice on December 13, 2005. See Ex. 61. Coverage under the policy was later restored without Mr. Gabriel going through the ordinary reinstatement process.

On February 13, 2007, Mr. Gabriel was sent another Grace Notice, which stated in the subject line that the "Total Amount Required to Continue Coverage [was] $9,596.15." Ex. 62. However, this figure was substantially higher than the actual premium payment of $2030.35 required to cover the negative cash value on the policy. This higher sum reflected Reassure America's internal policy of informing policyholders that they were "required" to pay a total premium payment that would cover not only the negative cash value as of the date of the letter, but also the projected monthly deductions until the next anniversary of the policy. On March 13, 2007, Mr. Gabriel sent Reassure America a check for the full $9596.15, drawn from his personal account. See Ex. 95.

Mr. Gabriel was sent additional Grace Notices on September 15, 2008, see Ex. 63, and November 13, 2008, see Ex. 64. Each

of these Grace Notices also stated that he was "required" to pay a sum substantially higher than the amount actually required by the terms of the policy to keep the '817 Policy in force. The September 2008 Grace Notice stated that he was required to remit $6164.36, despite the fact that a premium payment of $1777.74 would have been sufficient to cover the negative cash value of the policy. On September 9, 2008, Mr. Gabriel sent a premium payment of $2621.00, drawn on the account of R.J. Gabriel Construction. See Ex. 101.

Similarly, the November 2008 Grace Notice stated that Mr. Gabriel was required to pay $15,242.99, even though a premium payment of $2065.11 would have covered the negative cash value. On December 9, 2008, Mr. Gabriel authorized the transfer of the full $15,242.99 from the value of his '818 Policy. See Ex. 74. On December 24, 2008, Bradford Meigs' assistant contacted Reassure America to find out the minimum that would have been necessary to keep the policy in force until March 2009. See Ex. 81. On January 3, 2009, Reassure America faxed Mr. Meigs a letter explaining that a payment of $3829.78 would be sufficient to keep the policy in force until March 17, 2009. See Ex. 78.

C.    The March 15, 2010 Grace Notice

On February 13, 2010, following a monthly deduction, the Cash Surrender Value of the '817 Policy fell to minus $1019.12.

26

On March 15, 2010, Reassure America sent Mr. Gabriel a Grace Notice, which stated that the "Total Amount Required to Continue Coverage" was $10,852.64. The Grace Notice further stated:

> In order to keep your valuable coverage in force, remit your payment so that it is received . . . on or before April 18, 2010, which is the end of your Grace Period. If payment is not received . . . on or before April 18, 2010, your coverage will terminate effective April 18, 2010 unless your policy has a net cash value and provides for and coverage continues under any of the following: 1) a non-forfeiture option, 2) an option to discontinue premium payments, or 3) an automatic premium loan election.

Ex. 65. However, as of March 15, 2010, the negative cash value of the '817 Policy was only minus $2495.25. Accounting for the 9% load charge, a payment of $2742.03 would have been sufficient to bring the policy out of grace. Therefore, the amount that the March 15, 2010 Grace Notice stated was "required" was $8,110.61 greater than the amount required by the terms of the policy to continue coverage.[2]

The mailing date of this Grace Notice was consistent with Reassure America's internal policy to send such notices

---

[2] Donald Sanders, Jackson National's Vice President for Third-Party Administrator Oversight, also testified that even a payment of $1119.91 — the premium charge to cover only the first missed monthly deduction — would have been sufficient to take the policy out of grace. However, at the time of the March 15, 2010 Grace Notice, the actual negative cash value of the '817 Policy was minus $2495.25. The court finds that as of that date, the amount "required" to continue coverage could reasonably be the amount required to eliminate the negative cash value. This distinction is not material.

approximately 31 days before the end of the grace period. Under Reassure America's internal policy, the 61-day grace period started on the date of insufficiency for the next monthly deduction, not on the date the notice was sent or received. However, for the reasons explained in Part II, supra, the court has previously ruled that this practice constituted a breach of contract, and that the '817 Policy provided that the grace period would start no earlier than the date on which the Grace Notice was sent to the policy holder. Therefore, the March 15, 2010 Grace Notice should have provided Mr. Gabriel until at least May 15, 2010, to remit payment.[3]

The March 15, 2010 Grace Notice was mailed to R.J. Gabriel Construction. David Gabriel, who was Mr. Gabriel's son and the president of R.J. Gabriel Construction, opened the envelope containing the Grace Notice. It was then his responsibility to make premium payments for the '817 Policy. However, David Gabriel did not know very much about the '817 Policy. He did

---

[3] In light of the court's ruling on the applicability of §110B, Reassure America's failure to provide Mr. Gabriel with the full 61 days to make his payment is not material. Because Reassure America's inflated amount of the premium "required" did not comply with the notice provision of §110B, Reassure America was not entitled to terminate Mr. Gabriel's policy until three months after the time that the Cash Surrender Value of the policy became insufficient. Therefore, the termination date would be no earlier than May 13, 2010, regardless of whether the court's interpretation of the grace period provision in the '817 Policy is correct. See Part II, supra.

28

not know the identity of the beneficiary, Reassure America's policies for requesting premium payments, or the calculations on which the $10,852.62 "required" amount was based. He also did not know that a lesser payment would have been sufficient to keep the policy in force.

Due to seasonal fluctuations in business, R.J. Gabriel Construction did not have sufficient funds to pay the full $10,852.64 immediately. However, David Gabriel expected that the company would find some way to pay the "required" amount by the stated April 18, 2010 deadline. He did not contact Bradford Meigs or Thomas Melody, the R.J. Gabriel Construction accountant, about this Grace Notice.

Before the April 18, 2010 deadline stated in the Grace Notice, David Gabriel received an automatically generated quarterly Payment Notice from Reassure America. This notice stated that Mr. Gabriel should remit payment of $2621.00 by May 13, 2010. The notice also stated that "[p]ayment must be received by the due date shown above or your policy will enter its grace period and will terminate if the renewal premium is not received by the last day of the grace period." Ex. 52.

In reliance upon this Payment Notice, David Gabriel understood that he had until May 13, 2010, to make the necessary

payments.  Accordingly, he did not make any payment before April 18, 2010.

D.  Termination of the '817 Policy and Robert Gabriel's Death

On April 19, 2010, Reassure America sent Robert Gabriel a "Notice of Policy Termination." Ex. 66.  Upon discovering that the '817 Policy had terminated, Mr. Gabriel quickly attempted to submit payment and reinstate his coverage.

On May 5, 2010, Judith Gabriel was prepared to send Reassure America a check for the full $10,852.64, drawn from the account of PAD Corporation.  See Ex. 69.  However, when she spoke by telephone with a Reassure America representative, she was informed that the company would not accept payment and would return the check if it were mailed.  The parties have stipulated that any such payment would have been rejected.

Following the termination of the '817 Policy, Mr. Gabriel, with the assistance of Mr. Meigs, also attempted to have the policy reinstated through Reassure America's ordinary reinstatement procedures.  See Ex. 114.  However, due to Mr. Gabriel's poor health, his reinstatement request was denied.

Mr. Gabriel died on August 27, 2010.  Judith Gabriel, the executrix of his estate and the beneficiary under both the '817 and '818 Policies, received the $200,000 death benefit under the

'818 Policy, which had not lapsed.  Mrs. Gabriel did not make a claim under the '817 Policy.

### E.  Chapter 93A Demand Letter and Reassure America's Response

On July 1, 2011, counsel for Mrs. Gabriel sent a letter pursuant to Chapter 93A to Reassure America, demanding that the company pay Mrs. Gabriel the $500,000 death benefit under the '817 Policy.  See Ex. 71.  The demand letter asserted that the March 15, 2010 Grace Notice did not explain how the "required" sum of $10,852.64 was calculated.  The demand letter further stated that the April 2010 Payment Notice, which listed a due date for the quarterly Planned Periodic Premium of May 13, 2010, was unfair and deceptive.  The demand letter also claimed that Reassure America had improperly calculated the grace period.  It stated that, assuming the March 15, 2010 Grace Notice was received on March 19, 2010, the 61-day grace period should have ended on May 19, 2010.  Mr. Gabriel had attempted to pay the full $10,852.64 before that date.  The demand letter closed by contending that Reassure America's conduct constituted a breach of contract, breach of the implied covenant of good faith and fair dealing, and a violation of Chapter 176D and Chapter 93A.

On August 5, 2011, Reassure America responded to the Chapter 93A demand letter, denying Judith Gabriel's request for

benefits under the '817 Policy. This response was drafted by CSC, Reassure America's third-party administrator for the '817 Policy. The draft was then reviewed, edited, and finalized by Walk, a complaint specialist at Reassure America. Walk read the draft response in its entirety, focusing on any policy documents or specific provisions of the '817 Policy cited in the draft. However, Walk testified that she did not read the entire '817 Policy before sending the final version of the letter to Mrs. Gabriel's counsel.

The letter explained that "Reassure sent to Mr. Gabriel a 'Notice of Policy Termination' dated April 19, 2010, . . . . because Mr. Gabriel had not sent in the $10,852.64 stated in the above March 15th Notice (or any amount of premium) to keep the coverage in force." Ex. 70 at 5. The letter also stated that the sum of $10,852.64 "consisted of the policy's negative cash value at the time of the Notice, (-$2,495.25) plus the amount of premium needed to pay the policy to its next anniversary of September 13, 2010." Id. at 6. The letter explained that the company had calculated the Grace period based on a starting date of February 13, 2010. See id. at 8. In closing, the letter stated that:

> [A] review of the records indicates that the 817 Policy was administered in accordance with its terms and provisions. . . . Reassure sent a NOTICE OF POLICY GRACE PERIOD dated March 15, 2010 advising Mr. Gabriel

that a premium payment of $10,852.64 was required before the expiration of the 61-day Grace Period on April 18, 2010, in order to keep the coverage in force. The policy terminated when Mr. Gabriel failed to submit any premium before the end of the Grace Period. Reassure provided the proper policy and statutory notices to Mr. Gabriel advising him of the pending lapse of coverage and the subsequent policy termination.

Id. at 9. However, as Walk testified at trial, she understood at the time that $10,852.64 was not the amount required to keep coverage in force under the terms of the '817 Policy. Instead, she acknowledged that, when she reviewed and sent the August 2011 response letter, she knew that a lesser payment would have been sufficient.

There was no evidence that Reassure America relied on the advice of either in-house or outside counsel in responding to the Chapter 93A demand letter. Nor was there any evidence that anyone read the policy to see whether it complied with applicable laws.

On December 27, 2011, following her receipt of the response letter, Judith Gabriel filed the instant case.

F.   Misrepresentations by Reassure America

Based on the foregoing facts, the court finds that, on several occasions, Reassure America knowingly made false statements regarding the amount required to continue coverage under the '817 Policy. Most significantly, it knowingly made

such a false statement in the March 15, 2010 Grace Notice. Such misrepresentations were not restricted to Mr. Gabriel, but were part of Reassure America's general policy regarding Grace Notices.

These misrepresentations were intended to deceive the plaintiff, and to cause him to rely on that misrepresentation and pay more than the policy required. Reassure America employees testified that the misrepresentations were designed to benefit Mr. Gabriel by ensuring that his insurance coverage did not repeatedly enter and exit the grace period. However, the misrepresentations were also in the company's interest. By overstating the amount due, Reassure America was able to obtain, invest, and otherwise use the excess premium paid during the period before it actually became due. Prior to sending the March 15, 2010 Grace Notice, Reassure America had induced Robert Gabriel to make several overpayments in response to earlier false and misleading statements in its Grace Notices. For example, it received such inflated premium payments in March 2007, when Mr. Gabriel paid $9596.15 from his personal checking account, and in December 2008, when Mr. Gabriel transferred $15,242.99 from the '818 Policy.

The court's conclusion that these misrepresentations were made knowingly is reinforced by the testimony of Barbara Cowens,

the Senior Vice President of the company that owned Reassure America, Swiss Re. She testified that Reassure America employees knew that the amounts that the Grace Notices stated were "required" to continue coverage misrepresented the actual amount required to continue coverage. See September 8, 2014 Tr. at 66. She further testified that Reassure America could easily have provided customers the actual amount required to continue coverage in their Grace Notices, but chose to provide a higher amount. See id. at 63-66.

The conclusion that Reassure America knowingly misrepresented the amount required to continue coverage is further supported by the fact that there was a readily available alternative practice that would have provided similar benefits for the policyholders without involving such misrepresentations. In particular, the earlier Valley Forge Grace Notices stated both the amount that was actually required — a premium sufficient to cover the negative cash value of the policy — as well as a recommended premium payment that would cover deductions until the due date for the next Planned Periodic Premium. See Ex. 55. Therefore, when Reassure America acquired Valley Forge, it had a template that would have permitted it both to ensure compliance with the terms of the '817 Policy by listing the minimum required to continue coverage and to provide

a recommended amount that would cover deductions through the next Planned Periodic Premium date. Instead, Reassure America knowingly chose to state that the inflated amount had to be paid to maintain the policy.

The court also finds that the inflated amount in the March 2010 Grace Notice caused harm to the plaintiff. If Robert Gabriel had asked Reassure America to provide him with the minimum amount necessary to keep the '817 Policy in force, Reassure America would have supplied that information. The court also finds that Mr. Gabriel would have paid that lesser amount by April 18, 2010. However, David Gabriel, who was at that time responsible for making premium payments for the '817 Policy, relied on the plain language of the March 15, 2010 Grace Notice and did not realize that a lesser amount could have kept the policy from lapsing.

In addition, the court finds that if Reassure America had not sent the misleading Payment Notice in April 2010, David Gabriel or Robert Gabriel would have paid the full $10,852.64 by the April 18, 2010. Although R.J. Gabriel Construction did not have that amount available when it received the March 15, 2010 Grace Notice, Robert Gabriel's payment history for the '817 Policy demonstrates that he had access to a variety of sources of funds to pay the inflated amount demanded in earlier Grace

Notices. For example, he previously remitted payment from R.J. Gabriel Corporation, PAD Corporation, the '818 Policy, and his personal checking account.

In summary, the court finds that Reassure America knowingly misrepresented important facts about the '817 Policy, both in its March 15, 2010 Grace Notice to Mr. Gabriel and in its August 5, 2011 response to Judith Gabriel's Chapter 93A demand letter. Its misrepresentations in the Grace Notices caused harm to Judith Gabriel in the form of loss of the death benefits under the '817 Policy.

IV. DISCUSSION

The plaintiff claims that Reassure America engaged in unfair and deceptive business practices in violation of M.G.L. c. 93A, §§2, 9. The plaintiff argues that Reassure America violated Chapter 93A in three distinct ways, each of which injured the plaintiff: (1) by failing to comply with various provisions the '817 Policy and by misrepresenting the amount "required" to continue coverage in the March 15, 2010 Grace Notice; (2) by violating several provisions of M.G.L. c. 176D, §3(9), which governs the conduct of insurance companies when settling claims; and (3) by shifting its defenses during this litigation.

The court finds that Reassure America's breach of contract and misrepresentations were unfair and deceptive business practices in violation of Chapter 93A. The court further finds that this conduct was committed willfully and knowingly. Because the misrepresentation in the March 15, 2010 Grace Notice was the culmination of deliberate and repeated deceptive conduct by Reassure America pursuant to a policy that ignored the terms of its contract with Mr. Gabriel, the court finds that an award of treble damages is appropriate. In addition, the court is awarding the plaintiff her reasonable attorneys' fees and costs incurred in this litigation.

A.   Violation of Chapter 93A

1.   Legal Standard

Massachusetts General Laws c. 93A states that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." M.G.L. c. 93A, §(2)(a). Individuals have a private right of action under the statute. See id., §9. To prevail on a Chapter 93A claim, the plaintiff "must prove that a person who is engaged in trade or business committed an unfair or deceptive trade practice and that the [plaintiff] suffered a loss of money or property as a result." Morris v. BAC Home Loans Servicing, L.P., 775 F. Supp.2d 255, 259 (D. Mass. 2011).

In deciding whether a business practice is "unfair" in violation of Chapter 93A, Massachusetts courts apply a three-step framework for analysis, asking: "(1) whether the practice is at least within the penumbra of some common-law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; and (3) whether it causes substantial injury to consumers." Mass. Eye & Ear Infirmary v. QLT Phototherapeutics, Inc., 412 F.3d 215, 243 (1st Cir. 2005) (citing PMP Assocs., Inc. v. Globe Newspaper Co., 366 Mass. 593, 595 (1975)). Whether conduct is unfair is a question of fact to be determined based on the circumstances of each case. See Martin v. Factory Mut. Research Corp., 401 Mass. 621, 623 (1988).

Conduct is "deceptive" within the meaning of Chapter 93A "if it could reasonably be found to have caused a person to act differently from the way he otherwise would have acted." Aspinall v. Philip Morris Cos., 442 Mass. 381, 394 (2004) (quoting Purity Supreme, Inc. v. Attorney Gen., 380 Mass. 762, 777 (1980)). "The term ['deceptive'] 'goes far beyond the scope of the common law action for fraud or deceit.'" Incase, Inc. v. Timex Corp., 488 F.3d 46, 57 (1st Cir. 2007) (quoting Slaney v. Westwood Auto, Inc., 366 Mass. 688, 703 (1975)). "A successful G.L. c. 93A action based on deceptive acts or practices does not

require proof that a plaintiff relied on the representation, or that the defendant intended to deceive the plaintiff, or even knowledge on the part of the defendant that the representation was false." Aspinall, 442 Mass. at 394 (internal citations omitted).

A plaintiff must also show that the defendant's unlawful or deceptive practice caused her "injury." See M.G.L. c. 93A §9(1); Hershenow v. Enterprise Rent-A-Car Company of Boston, Inc., 445 Mass. 790, 791, 797 (2006). As the Massachusetts Supreme Judicial Court ("SJC") has explained, "a plaintiff bringing an action for damages under c. 93A, §9, must allege and ultimately prove that she has, as a result, suffered a distinct injury or harm that arises from the claimed unfair or deceptive act itself." Tyler v. Michaels Stores, Inc., 984 N.E.2d 737, 745-46 (Mass. 2013). The term "injury" encompasses "loss of money, loss of property, or personal injury," Hershenow, 445 Mass. at 799, as well as "the invasion of any legally protected interest of another," id. at 800 (quoting Leardi v. Brown, 394 Mass. 151, 159 (1985)).

### 1. Misrepresentation

The court has found that Reassure America made several misrepresentations regarding the amount required to continue coverage under the '817 Policy. The court now finds that these

misrepresentations constituted deceptive conduct in violation of Chapter 93A.

As explained earlier, each time that Reassure America sent Mr. Gabriel a Grace Notice, it substantially overstated the amount that Mr. Gabriel was "required" to pay to continue coverage. Most significantly, as plaintiff alleges, in the March 15, 2010 Grace Notice, Reassure America stated that Mr. Gabriel was required to pay $10,852.64 in order to continue coverage under the '817 Policy. In fact, he was only required to pay $2495.25.

This misrepresentation constituted "deceptive" conduct in violation of Chapter 93A because it could reasonably have caused a person to act differently than he otherwise would have acted. See Aspinall, 442 Mass. at 394. Like its predecessors, the March 15, 2010 Grace Notice stated that Mr. Gabriel was "required" to pay an inflated amount of money to prevent his coverage from being terminated. He reasonably could have believed that to be the amount that it was necessary to pay to keep the policy in force. This misrepresentation could reasonably have caused Mr. Gabriel to pay the falsely inflated amount stated in the Grace Notice, rather than the more affordable, lesser amount required under the terms of the policy to keep the policy in force.

The court also finds that the April 2010 Payment Notice constituted a deceptive act by Reassure America. That notice stated that Mr. Gabriel had to pay $2621.00 by May 13, 2010, and failure to do so would cause the policy to "enter its grace period." See Ex. 52. This conflicted with the previously received March 15, 2010 Grace Notice. A person who intended to pay in response to the March 15, 2010 Grace Notice could reasonably have decided that the April 2010 Payment Notice stated the correct amount and schedule for payment, relied on it, and acted differently than he otherwise would have.

If Reassure America had not inflated the amount required for the continuation of coverage by at least $8110.61 in the March 15, 2010 Grace Notice, David Gabriel would have made the properly calculated minimum payment before the policy was terminated. In addition, Reassure America's deceptive April 2010 Payment Notice caused David Gabriel not to pay the $10,852.64 demanded in the Grace Notice. Each of these misrepresentations caused David Gabriel to fail to pay the amount required to keep the policy in force. As a result of these misrepresentations, Mr. Gabriel's insurance coverage lapsed. Subsequently, as a direct result of these misrepresentations, his estate was deprived of the death

benefits that otherwise would have been payable, and paid, under the policy.

### 2.   Breach of Contract

The court also finds that Reassure America violated Chapter 93A, §2 by breaching the '817 Policy in a coercive manner.

The First Circuit has explained that "a mere breach of contract does not constitute an unfair or deceptive trade practice under 93A, see Ahern[ v. Scholz], 85 F.3d [774,] 798 [(1st Cir. 1996)], unless it rises to the level of 'commercial extortion' or a similar degree of culpable conduct, Anthony's Pier Four, Inc. v. HBC Assocs., 583 N.E.2d 806, 821 (1991)." Commercial Union Ins. Co. v. Seven Provinces Ins. Co, Ltd., 217 F.3d 33, 40 (1st Cir. 2000). When presented with Chapter 93A claims relating to breach of contract, courts "focus on the nature of challenged conduct and on the purpose and effect of that conduct." Mass. Employers Ins. Exchange v. Propac-Mass, Inc., 648 N.E.2d 435, 438 (Mass. 1995). "Not every breach of contract constitutes a violation of G.L. c. 93A, but a knowing violation of contractual obligations for the purpose of securing unwarranted benefits does. Courts must consider whether the nature, purpose, and effect of the challenged conduct is coercive or extortionate." Diamond Crystal Brands, Inc. v.

43

Backleaf, LLC, 803 N.E.2d 744, 748-49 (Mass. App. Ct. 2004) (citations omitted).

The court has previously held that Reassure America breached the '817 Policy in two ways: (1) by failing to include in its Grace Notices the minimum payment required to keep the policy in force; and (2) by failing to provide Mr. Gabriel with the full 61-day grace period to remit such a payment. The court now finds that at least the first breach also constitutes a violation of Chapter 93A by virtue of its extortionate character.

As explained earlier, Reassure America designed its Grace Notices to require a premium payment that would cover not only monthly payments that Mr. Gabriel had already missed, but also future payments that would keep the policy in force through its next anniversary. However, this practice violated the provision of the '817 Policy that specified that: "A grace period of 61 days will be granted for the payment of a premium large enough to cover the monthly deduction. Notice of such premium will be mailed to your last known address." '817 Policy at 10 (emphasis added).

Every time Reassure America breached the contract by overstating the amount "required," it was threatening to terminate Mr. Gabriel's coverage unless he paid more than he

owed under the contract. On multiple occasions, these breaches resulted in Mr. Gabriel paying more than he was obligated to pay under the contract. The March 15, 2010 Grace Notice was a deliberate attempt to coerce Mr. Gabriel to do so again. This extortionate breach of contract constituted a Chapter 93A violation. See Diamond Crystal, 803 N.E.2d at 748.

Although representatives for Reassure America testified that this practice was intended to benefit Mr. Gabriel, the court finds that its primary purpose was to benefit the company. By overstating the amount due, the company was able to obtain, invest, and otherwise use the excess premium paid during the period before which it became due. Obtaining premature payments of premiums also reduced the work the company was required to perform to administer the policy. The repeated breaches of contract, particularly the March 15, 2010 Grace Notice, were primarily for the "purpose of securing unwarranted benefits" and constituted a violation of Chapter 93A. See id.

This coercive breach of contract injured Mr. Gabriel. He was repeatedly induced to pay excess premiums before they came due. This deprived him of the use of that money in the period before the premiums became due. Most significantly, the March 15, 2010 Grace Notice caused David Gabriel's failure to timely pay the amount required to keep the policy in force. As

45

explained earlier, this resulted in the termination of the '817 Policy, and deprived Mr. Gabriel's estate of the benefits of his insurance policy.

### 4. The Plaintiff's Alternative Theories

In view of the court's decision that Reassure America violated Chapter 93A, §2 by misrepresenting the amount necessary to continue coverage, it is not necessary to decide the plaintiff's alternative theories of liability. Resolving the plaintiff's claims under M.G.L. c. 176D §3(9) would require the court to resolve unsettled questions of Massachusetts law. For example, most of Reassure America's misconduct in the instant case occurred before Mrs. Gabriel filed a claim under the '817 Policy. It is unclear whether such misconduct could violate M.G.L. c. 176D §3, which prohibits "unfair claim settlement practice[s]."

In addition, it is unclear whether the defendant's litigation tactics amount to a violation of Chapter 93A. The defendant's belated assertion of an ERISA preemption defense and its changing position on the applicability of §110B delayed and increased the expense of this litigation. However, the court need not decide whether it constituted a "bad-faith pattern of constantly shifting objections" that was "intended to pressure

[the plaintiff] into a settlement." <u>Commercial Union Ins. Co.</u> <u>v. Seven Provinces Ins. Co.</u>, 217 F.3d 33, 42 (1st Cir. 2000).

Accordingly, the court is not addressing whether Reassure America's conduct violated M.G.L. c. 176D §3(9), or whether the defendant violated Chapter 93A by shifting its defenses during this litigation.

### B. <u>Multiple Damages</u>

#### 1. <u>Legal Standard</u>

A plaintiff who proves that she has been injured by a business's unfair or deceptive practices is entitled to recover her actual damages under Chapter 93A. <u>See</u> M.G.L. c. 93A §9(3). Actual damages include all losses that are the "foreseeable consequences of the defendant's unfair or deceptive act or practice." <u>DiMarzo v. Am. Mut. Ins. Co.</u>, 389 Mass. 85, 101 (1983).

Chapter 93A also provides for an alternative award of multiple damages in certain cases. <u>See</u> <u>Rhodes v. AIG Domestic Claims, Inc.</u>, 461 Mass. 486, 505 (2012) ("A prevailing plaintiff does not receive both actual damages and multiple damages—it is one or the other."). To receive multiple damages, the plaintiff must first establish that the defendant did not make a reasonable written offer of settlement in response to the plaintiff's Chapter 93A demand letter. <u>See</u> M.G.L. c. 93A §9(3);

47

<u>Heller v. Silverbranch Const. Corp.</u>, 376 Mass. 621, 626 (1978).

If the defendant did not make such an offer, Chapter 93A "authorizes the judge to award up to three, but not less than two, times the amount of actual damages if he finds a willful or knowing violation of c. 93A §2, or that the refusal to grant relief on demand was made in bad faith with knowledge or reason to know that the practice complained of violated §2." <u>Heller</u>, 376 Mass. at 627; <u>see also</u> M.G.L. c. 93A, §9(3).

"Like punitive damages in tort law, multiple damages under G.L. c. 93A serve the twin 'goals of punishment and deterrence.'" <u>Kraft Power Corp. v. Merrill</u>, 464 Mass. 145, 158 (2013) (quoting <u>International Fid. Ins. Co. v. Wilson</u>, 387 Mass. 841, 858 (1983)). The "assessment of multiple damages is premised on a defendant's wrongful conduct, and not the amount of harm suffered by a plaintiff." <u>Id.</u> at 157.

In assessing the defendant's culpability, the relevant question is whether the defendant "willfully or knowingly employed an unfair or deceptive practice," not whether it knowingly violated Chapter 93A. <u>See</u> <u>Heller</u>, 376 Mass. at 627. As explained by Judge Robert Keeton:

> To prove that the defendant committed a knowing violation by fraud, the plaintiff may show that agents of the defendant knew that the fact they represented to be true was not true. Similarly, to prove that the defendant committed a willful violation by fraud, the plaintiff may prove that agents of the defendant knew

48

> that they did not know whether the fact represented was
> true or false — that they made the representation
> without knowing whether it was true or false and with
> reckless disregard for whether it was true or false.
> Though not the equivalent of proving the state of mind
> of knowing the falsity of the fact represented, this is
> nevertheless proof of a culpable state of mind — the
> state of mind of willful disregard for truth or falsity
> of the fact represented.

Computer Sys. Eng'g v. Qantel Corp., 571 F. Supp. 1365, 1375 (D.

Mass. 1983) (emphasis added). On appeal, the First Circuit

stated that "[w]e accept Judge Keeton's comprehensive and

scholarly analysis, and affirm his interpretation of the

language 'willful or knowing violation' on the basis of his

opinion." Computer Sys. Eng'g v. Qantel Corp., 740 F.2d 59, 68

(1st Cir. 1984). The Massachusetts courts have since confirmed

Judge Keeton's analysis. See, e.g., Kattar v. Demoulas, 433

Mass. 1, 15 (2000) ("[A] finding of 'willful' conduct within the

meaning of c. 93A is satisfied where the defendant has acted

recklessly."); Montanez v. Bagg, 24 Mass. App. Ct. 954, 956

(1987) (A defendant acts willfully if it makes a false

representation "without knowing whether it was true or false and

with reckless disregard for whether it was true or false.");

Shaw v. Rodman Ford Truck Center, Inc., 19 Mass. App. Ct. 709,

711 (1985) ("[A] misrepresentation known to be false when it is

made can be found to be a 'knowing' violation" of Chapter 93A

§2.).

2. Analysis

Reassure America did not make a settlement offer in response to plaintiff's Chapter 93A demand letter. See Ex. 70 (defendant's response to demand letter). Therefore, the court must determine whether it acted knowingly or willfully in violating Chapter 93A.

Reassure America knowingly misrepresented the amount "required" to keep the policy in force in its Grace Notices. Reassure America had an internal policy of informing policyholders that they were required to pay a total premium payment that would cover not only the negative cash value as of the date of the letter, but also the projected monthly deductions until the next anniversary of the policy. The court has found that Reassure America knew that the Grace Notices did not accurately state the amount "required" to continue coverage under the '817 Policy. Reassure America could have provided the correct amount required to continue coverage, but knowingly chose to provide a false higher amount. See Sept. 8, 2014 Tr. at 66 (testimony of Barbara Cowens). Reassure America's misrepresentations were, therefore, knowingly deceptive acts in violation of Chapter 93A §2. See Shaw, 19 Mass. App. Ct. at 711.

Reassure America's coercive breach of contract was a willful violation of Chapter 93A. The court has found that no Reassure America employee made an effort to determine whether the '817-type policies were being properly administered in accordance with their terms. Similarly, when Reassure America stopped using the Valley Forge templates in administering the '817-type policies, no Reassure America employee attempted to determine whether the updated Grace Notice templates complied with the terms of the policies. This reckless disregard for whether the Grace Notices complied with the terms of the '817 Policy constitutes a "willful" violation of Chapter 93A. See Kattar, 433 Mass. at 15.

Accordingly, the plaintiff is entitled to at least double damages because Reassure America's misconduct was both "willful" and "knowing." M.G.L. c. 93A §9(3).

### 3. Damages Multiplier

Chapter 93A §9(3) gives the trial judge substantial discretion in choosing an appropriate multiplier between double and treble damages. See Hug v. Gargano & Assocs., P.C., 76 Mass. App. Ct. 520, 528 (2010). While "neither c. 93A nor [Massachusetts] cases provide a trial judge with clear guidance in deciding how damages should be multiplied, the decision is to be based on the egregiousness of the conduct." Id. (quoting

Brown v. LeClair, 20 Mass. App. Ct. 976, 980 (1985)). The punitive damage award should "serve the twin 'goals of punishment and deterrence.'" Kraft Power Corp., 464 Mass. at 158 (quoting Internat'l Fid. Ins., 387 Mass. at 358).

The court finds that an award of treble damages is most appropriate in this case. Reassure America's misconduct was egregious. For years, Reassure America repeatedly informed Mr. Gabriel that he had to pay several thousands of dollars of premiums well before those premiums actually became due, knowing that its characterization of the required amount was false. See Aleo v. SLP Toys USA, Inc., 466 Mass. 398, 414-15 (2013) (repetitious misconduct heightens the defendant's culpability for purpose of punitive damages). The misrepresentations were made to benefit Reassure America at the expense of Mr. Gabriel. By using its informational advantage and the threat of cancelling policy coverage, it was able to extort excess payments from Mr. Gabriel months before they were due.[1]

---

[1] The court is trebling the damages based on Reassure America's conduct concerning Mr. Gabriel alone. See Philip Morris USA v. Williams, 549 U.S. 346, 349 (2007) (The Due Process Clause prohibits an award of punitive damages based "in part upon [a] desire to punish the defendant for harming persons who are not before the court." (emphasis in original)). However, the court notes that Reassure America's unlawful practice created a substantial risk that other policyholders also overpaid premiums and/or lost benefits they otherwise would have received because of Reassure America's unlawful practices.

Reassure America's misrepresentations were the result of its deliberate choice to stop using the Grace Notices that were used by Valley Forge. The Valley Forge Grace Notices contained no misrepresentations and complied with the terms of the '817 Policy. Reassure America changed the way the '817-type policies were administered, employing Grace Notices that contained knowingly false representations.

Furthermore, the court finds that an award of treble damages is appropriate to deter the defendant from engaging in similar misconduct in the future. Reassure America's deceptive conduct was the product of a companywide internal policy to inflate the amount that a customer owed in Grace Notices. This deceptive policy continued in effect for years, even though Reassure America knew it was being untruthful to its customers. A treble damages award is justified to deter such prolonged, calculated deception.

In addition, "[r]egardless of culpability . . . heavier punitive awards have been thought to be justifiable when wrongdoing is hard to detect (increasing chances of getting away with it)." <u>Exxon Shipping Co. v. Baker</u>, 554 U.S. 471, 494 (2008). This is such a case. Reassure America's deceitful practices were difficult to detect. The Grace Notices did not indicate that customers could pay a lesser amount to avoid

53

cancellation of their policies. Policyholders reasonably rely on representations made by an insurance company, which is in the business of administering its policies. A customer could receive these notifications for years without realizing that the Grace Notices misrepresented the amount required to keep a policy in force. Reassure America's deceptive policy was exposed in this case only because it resulted in the wrongful cancellation of Mr. Gabriel's policy and Mrs. Gabriel made the arduous, and expensive, effort to investigate and litigate her claim.

In view of the foregoing, the court concludes that Reassure America's knowing and willful, prolonged, repeated, and coercive misconduct makes an award of treble damages most appropriate.

## C. Calculation of Damages

### 1. The Formula

"[T]he amount of actual damages to be multiplied by the court shall be the amount of the judgment on all claims arising out of the same and underlying transaction or occurrence, regardless of the existence or nonexistence of insurance coverage available in payment of the claim." M.G.L. c. 93A §9(3). As the SJC has explained, "if a defendant commits a willful or knowing c. 93A violation that finds its roots in an event or a transaction that has given rise to a judgment in

favor of the plaintiff, then the damages for the c. 93A violation are calculated by multiplying the amount of that judgment." Rhodes v. AIG Domestic Claims, Inc., 461 Mass. 486, 499 (2012). However, any prejudgment interest awarded on the underlying judgment is not subject to multiplication. See City Coal Co. of Springfield v. Noonan, 434 Mass. 709, 715-16 (2001); McEvoy Travel Bureau, Inc. v. Nortion Co., 408 Mass. 704, 719 (1990).

## 2. Actual Damages

The plaintiff has proven $500,000 in actual damages. The court finds that injury was caused independently by Reassure America's breach of contract, by its violation of Chapter 175, §110B, and by its violation of Chapter 93A.

As explained earlier, the court is entering judgment on the plaintiff's breach of contract claim, as well as the §110B claim. Under the court's contract and §110B rulings, Mr. Gabriel had until at least May 13, 2010, to make the payment necessary to keep the policy in force. The parties stipulated that plaintiff tendered payment in the full, inflated amount of $10,852.64, on May 5, 2010. Reassure America's improper refusal to accept this payment violated both §110B and the terms of the '817 Policy, and resulted in the wrongful termination of the

'817 Policy. This deprived the plaintiff of the $500,000 death benefit under the policy.

As also explained earlier, Reassure America's Chapter 93A violations independently caused the plaintiff to lose the $500,000 death benefit. Actual damages are "those losses which were the foreseeable consequence of [Reassure America's] unfair or deceptive conduct . . . ." DiMarzo, 389 Mass. at 101. If the March 15, 2010 Grace Notice had not misrepresented the "required" payment, David Gabriel would have made a payment sufficient to keep the policy in force prior to April 18, 2010. It was foreseeable to Reassure America that sending deceptive Grace Notices that overstated the amount "required" to keep the policy in force would cause customers who could not afford to pay the higher, false amount to fail to make a premium payment sufficient to keep the policy in force.

Furthermore, if Reassure America had not sent the deceptive April 2010 Payment Notice, David Gabriel would have paid the full amount requested in the March 15, 2010 Grace Notice prior to April 18, 2010. As discussed earlier, the April 2010 Payment Notice stated that the "policy will enter its grace period" if $2621 was not received by May 13, 2010. See Ex. 52 (emphasis added). It was foreseeable to Reassure America that sending

such a Payment Notice would cause a recipient to disregard an earlier Grace Notice.

These misrepresentations caused David Gabriel to fail to make a sufficient payment to keep the '817 policy in force. Consequently, Mr. Gabriel's insurance coverage was terminated. Because his insurance coverage was terminated, the plaintiff was deprived of the policy's $500,000 death benefit.

Therefore, the plaintiff has proven that she suffered $500,000 in actual damages due to Reassure America's conduct.

### 3. Prejudgment Interest

"When a plaintiff obtains a jury verdict in a diversity case in which the substantive law of the forum state supplies the rules of decision, that state's law governs the plaintiff's entitlement to prejudgment interest." Crowe v. Bolduc, 365 F.3d 86, 90 (1st Cir. 2004). This is a diversity case based on Massachusetts law. Therefore, the court looks to Massachusetts law to determine the prejudgment interest to which plaintiff is entitled.

Massachusetts law provides for prejudgment interest in actions based on contractual obligations:

> In all actions based on contractual obligations, upon a verdict, finding or order for judgment for pecuniary damages, interest shall be added by the clerk of the court to the amount of damages, at the contract rate, if established, or at the rate of twelve per cent per annum from the date of the breach or demand.

M.G.L. c. 231, §6C.   The purpose of awarding interest is "so that a person wrongfully deprived of the use of money should be made whole for his loss."   <u>Sterilite Corp. v. Continental Cas. Co.</u>, 397 Mass. 837, 841 (1986) (quoting <u>Perkins School for the Blind v. Rate Setting Comm'n</u>, 383 Mass. 825, 835 (1981)).

Plaintiff has proven $500,000 in actual damages in this "action based on contractual obligations."   M.G.L. c. 231, §6C. She is, therefore, entitled to prejudgment interest on that award "from the date of the breach or demand."   <u>Id.</u>

Reassure America first breached the '817 Policy when it sent Mr. Gabriel a Grace Notice on November 14, 2005, that misrepresented the amount "required" to keep the policy in force.   It also breached the contract by sending misleading Grace Notices in February and March 2007, September and November 2008, and March 2010.   Finally, it breached the contract when it terminated the '817 Policy on April 18, 2010, one month before it was permitted to do so under the terms of the policy.

However, under the terms of the '817 Policy, the plaintiff was not entitled to receive the $500,000 death benefit until Mr. Gabriel's death, on August 27, 2010.   The court finds that she has been "wrongfully deprived of the use of" the insurance proceeds since Mr. Gabriel's death.   See <u>Sterilite Corp.</u>, 397

58

Mass. at 841. Therefore, the court is awarding her prejudgment interest from August 27, 2010.

The '817 Policy does not establish a prejudgment interest rate. Therefore, plaintiff is entitled to the Massachusetts' statutory rate of twelve percent. The prejudgment interest is being awarded only on the $500,000 in actual damages, and not on the punitive portion of the award. See City Coal, 434 Mass. at 715-16. But see Cohen v. Liberty Mut. Ins. Co., 41 Mass. App. Ct. 748, 756 (1996) ("[T]he plaintiff is entitled to a judgment of treble the amount of (1) his actual damages [of the amount of the withheld insurance proceeds] and (2) interest on that amount between [the date that the insurance company learned of its obligation to pay] and the entry of judgment.").

#### 4. The Total Award

In view of the foregoing, the court is ordering the entry of judgment in the plaintiff's favor for $1,774,849.32, which is $1,500,000 (three times the actual damages of $500,000) plus (twelve-percent per annum interest on $500,000 accrued between August 27, 2010, and the entry of judgment, March 26, 2015). See City Coal, 434 Mass. at 715-16; Rhodes, 461 Mass. at 499.

### D. Attorneys' Fees

"If the court finds in any action commenced [under Chapter 93A, §9] that there has been a violation of [Chapter 93A]

section two, the petitioner shall, in addition to other relief provided for by this section and irrespective of the amount in controversy, be awarded reasonable attorney's fees and costs incurred in connection with said action." M.G.L. c. 93A, §9(4). The court has found that the plaintiff proved that Reassure America committed deceptive and unfair practices in violation of Chapter 93A, §2. Therefore, she is entitled to her reasonable attorneys' fees and costs in connection with this action.

The First Circuit has stated that, when awarding attorneys' fees in an action under Chapter 93A, district courts should follow the approach adopted by the SJC in Linthicum v. Archambault, 379 Mass. 381 (1984). See Computer Sys. Eng'g, 740 F.2d at 71. The attorneys' fees awarded under Chapter 93A "is to be determined by what the 'services were objectively worth.'" Id. (quoting Heller, 376 Mass. at 629). "The amount is 'largely discretionary,' taking into account 'the nature of the case and the issues presented, the time and labor required, the amount of damages involved, the result obtained, the experience, reputation and ability of the attorney, the usual price charged for similar services by other attorneys in the same area, and the amount of awards in similar cases.'" Id. (quoting Linthicum, 379 Mass. at 381). The plaintiff must submit

sufficient documentation to enable the judge to "evaluate the hours spent on particular aspects of the case or the precise nature of the work." Twin Fires Inv., LLC v. Morgan Stanley Dean Witter & Co., 445 Mass. 411, 428 (2005).

When a plaintiff brings a Chapter 93A claim together with a number of other claims, the "award of fees and costs under chapter 93A should generally include an amount only for those fees and costs that were incurred in connection with the chapter 93A portion of the case." Federal Ins. Co. v. HPSC, Inc., 480 F.3d 26, 37 (1st Cir. 2007) (quoting Incase, Inc. v. Timex Corp., 421 F. Supp. 2d 226, 244 (D. Mass. 2006)). However, "where the chapter 93A and accompanying common law claims are largely based on identical facts, it may not be feasible to apportion the attorneys' fees between the two types of claims." Incase, Inc., 421 F. Supp. 2d at 244 (citing Twin Fires Inv., 445 Mass. at 430).

Plaintiff asserted nine claims, one of which arose under Chapter 93A, §9. The eight other claims arose out of identical facts and required the plaintiff to prove the same misconduct as the Chapter 93A claim. Therefore, the court finds that

plaintiff is entitled to all of her reasonable attorneys' fees and costs incurred in this litigation.[2]

The court is ordering the parties to confer and report on whether they can agree on the appropriate amount of attorneys' fees to be awarded to plaintiff. If not, the court will decide the matter after it is briefed by the parties.

V.   ORDER

In view of the foregoing, it is hereby ORDERED that:

1.   As agreed by the parties, the Plaintiff's Request for the Court to Enter Judgment on Count I and Count VIII (Docket No. 159) is ALLOWED and judgment shall enter for the plaintiff on Count I and Count VIII.

2.   Judgment shall enter for plaintiff on Count IX in the amount of $1,500,000 (three times $500,000) plus twelve-percent interest per annum accrued on $500,000 from August 27, 2010, which amounts to $274,849.32, for a total of $1,774,849.32.

3.   The Plaintiff's Unopposed Motion to Dismiss Counts II, III, IV and VI of the Complaint Without Prejudice (Docket No. 163) is ALLOWED.

---

[2] However, the plaintiff should not receive attorneys' fees or costs for efforts expended on discrete issues "wholly unrelated to proving the chapter 93A portion of the case."   Incase, 421 F. Supp. 2d at 244 (citing Wasserman v. Aganastopoulos, 22 Mass. App. Ct. 672, 682 (1986)).   If the parties identify any such issues, they should not be included in the calculation of the plaintiff's attorneys' fees.

4.  The parties shall confer and, by April 15, 2015, report whether they have agreed on the amount of attorneys' fees to be awarded.

5.  If the parties have not reached an agreement concerning attorneys' fees:

a.  Plaintiff shall, by April 24, 2015, file a motion for attorneys' fees.  The motion shall be supported by "detailed contemporaneous time records" and other documentation of costs supporting the requested fee award.  See <u>Grendel's Den, Inc. v. Larkin</u>, 749 F.2d 945, 952 (1st Cir. 1984).

b.  The defendant shall respond to the plaintiff's motion for attorneys' fees by May 8, 2015.

c.  Any reply shall be filed by May 15, 2015.


UNITED STATES DISTRICT JUDGE